**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **ANTHONY S. BRUNETTI**, *individually and on behalf of all others similarly situated*,<br>Plaintiff,<br>v.<br>**MAULDIN & JENKINS, LLC,**<br>Defendant. | Case No. ____________<br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony S. Brunetti ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Mauldin & Jenkins, LLC ("Defendant" or "M&J"), and alleges, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this putative class action against Defendant Mauldin & Jenkins, LLC for its failure to use reasonable means to safeguard the highly sensitive personal information entrusted to it by its clients—and the customers of its clients—in the ordinary course of providing tax, accounting, assurance, and advisory services.

2. Defendant is a Top 100 certified public accounting firm headquartered in Atlanta, Georgia, that holds itself out as providing "assurance, tax, advisory and

business consulting services" to a broad client base, including individuals, businesses, governmental entities, financial institutions, non-profit organizations, and other employers located "across the Southeast and beyond."[1]

3. In the ordinary course of its business, Defendant collected and maintained voluminous personally identifiable information ("PII") belonging to Plaintiff and Class Members, including, at a minimum, their full names, Social Security numbers, and financial account numbers.

4. Between approximately March 20, 2026 and April 3, 2026, an unauthorized third party gained access to Defendant's network through a Mauldin & Jenkins employee's computer and viewed certain client files within Defendant's tax software (the "Data Breach").

5. Defendant became aware of unusual activity associated with the affected employee's computer in April 2026, and a subsequent investigation revealed that client files in Defendant's tax software "may have been viewed without authorization" during the intrusion window.[2]

6. On or about May 11, 2026—over a month after the unauthorized access ended—Defendant began sending written notices of the Data Breach (the "Notice

---

[1] *See* Mauldin & Jenkins, About Us, https://www.mjcpa.com/about-us/ (last visited May 2026); Mauldin & Jenkins, https://www.mjcpa.com/ (last visited May 2026).
[2] *See* Data Breach Notice Letter to Plaintiff, dated May 11, 2026.

Letter") to affected individuals. Plaintiff received a Notice Letter dated May 11, 2026.

7. According to the Notice Letter, the information involved in the Data Breach "may have included your name, Social Security number, and/or financial account number."[3]

8. Defendant's Notice Letter is deficient in numerous material respects. Among other things, it does not identify the unauthorized actor; does not disclose the root cause of the intrusion; does not disclose how the intrusion occurred or what vulnerabilities were exploited; does not disclose whether data was exfiltrated, copied, or transmitted to third parties; does not identify with particularity what information was accessed as to each individual; does not state how many people were impacted; and does not disclose what remedial steps, if any, Defendant has actually implemented to prevent further breaches.

9. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered concrete injuries, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including reviewing financial accounts, checking credit, and changing passwords; (v) loss of benefit of the bargain; (vi) actual misuse

[3] *Id.*

of compromised data, including an increase in spam communications; (vii) nominal damages; and (viii) the continued and substantially increased risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosure so long as Defendant fails to undertake appropriate and adequate measures to protect it.

10. Defendant's offer of just 12 months of credit monitoring through Kroll is wholly inadequate to compensate Plaintiff and Class Members. The PII compromised in the Data Breach—particularly Social Security numbers—cannot be "cancelled" or "closed" like a credit card. Once Social Security numbers are in the hands of cyber-criminals, the risk of identity theft and fraud persists for years, if not for the remainder of the victim's life.

11. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII from a foreseeable cyber-attack. As an accounting firm in possession of voluminous Social Security numbers, financial account numbers, and other highly sensitive tax-related PII, Defendant was an obvious and predictable target for cyber-criminals.

12. Plaintiff brings this action to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data

Breach, and seeks damages, injunctive and declaratory relief, attorneys' fees and costs, and other appropriate relief.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 members; and at least one Class Member is a citizen of a state different from Defendant.

14. This Court has personal jurisdiction over Defendant because Defendant is a Georgia limited liability company with its principal place of business in this District, and it transacts substantial business in this District. Under the Class Action Fairness Act, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10). Thus, as an LLC, Defendant is a citizen of Georgia, which is its state of formation and principal place of business.

15. Plaintiff and Class Members are clients of Defendant, who reside across the country. They reside in the states where Defendant has physical offices, including Georgia, Alabama, Florida, Louisiana, South Carolina, North Carolina,

Tennessee, Texas, and beyond.[4]

16. Accordingly, minimal diversity under CAFA exists because Defendant, as an LLC, is a citizen of the State of Georgia, and Class Members are citizens of states throughout the "Southeast and beyond"[5] in states other than Georgia.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendant's principal office is located in Cobb County, Georgia, within the Atlanta Division of this District.

## PARTIES

18. Plaintiff Anthony S. Brunetti is, and at all relevant times was, a natural person and citizen of the State of Georgia, residing in Dahlonega, Georgia. Plaintiff intends to remain a Georgia resident.

19. Defendant Mauldin & Jenkins, LLC is a Georgia limited liability company with its principal office at 200 Galleria Parkway, Suite 1700, Atlanta, Georgia 30339. Defendant was formed on October 4, 1995, and its registered agent for service of process in Georgia is Adam Fraley, located at 200 Galleria Parkway, Suite 1700, Atlanta, Georgia 30339.

## FACTUAL ALLEGATIONS

[4] *See* Mauldin & Jenkins, About Us, https://www.mjcpa.com/about-us/ (last visited May 2026); Mauldin & Jenkins, https://www.mjcpa.com/ (last visited May 2026).
[5] Mauldin & Jenkins, About Us, https://www.mjcpa.com/about-us/ (last visited May 2026).

***Defendant's Business***

20. Defendant is a licensed independent certified public accounting firm that provides assurance, tax, advisory, and business consulting services to its clients. Defendant's clients include individuals, businesses, governmental entities, financial institutions, educational institutions, charitable, tax-exempt, and non-profit organizations, and other employers.

21. Defendant is based in the Southeast, operating through its offices in Georgia, Alabama, Florida, Louisiana, South Carolina, North Carolina, Tennessee, and Texas. Defendant services clients residing in the Southeast, and throughout the rest of the country as well.[6]

22. Defendant has been recognized as a Top 100 firm by Accounting Today and Inside Public Accounting,[7] and holds itself out to clients and the public as a sophisticated professional services firm capable of handling the sensitive personal and financial information that its services require.

23. In the ordinary course of its business, Defendant collects, uses, and stores highly sensitive PII belonging to Plaintiff and Class Members, including, but not limited to: full names; Social Security numbers and other government-issued

[6] *See* Mauldin & Jenkins, About Us, https://www.mjcpa.com/about-us/ (last visited May 2026); Mauldin & Jenkins, https://www.mjcpa.com/our-locations (last visited May 2026).
[7] *See* Mauldin & Jenkins, Awards & Recognition, https://www.mjcpa.com/awards-recognition/ (last visited May 2026).

identification numbers; financial account numbers; tax-related personal and business financial information (including assets, income, sources of income, losses, expenditures, investment accounts, retirement accounts, and bank accounts); employee benefit plan participant information; payroll and compensation information; and other sensitive information bearing on tax filings and financial transactions.

24. As stated in Defendant's own Privacy Policy, the categories of personal information Defendant collects include "government-assigned identification numbers such as driver's license numbers, social security numbers and other tax identification numbers," as well as "personal and business financial and tax information, including information regarding assets, income and sources of income, losses, expenditures and purchases, charitable donations, investments and investment accounts, retirement accounts, bank accounts, and other financial accounts."[8]

25. Plaintiff and Class Members are individuals whose PII was collected, used, and maintained by Defendant in connection with Defendant's rendering of tax, accounting, assurance, advisory, or business consulting services—whether directly,

[8] Mauldin & Jenkins, Privacy Policy, https://www.mjcpa.com/privacy-policy/ (last visited May 2026).

as M&J's own clients, or indirectly, through employers, plan sponsors, financial institutions, or other entities for which M&J performs services.

26. Plaintiff and Class Members entrusted their PII to Defendant on the mutual understanding that Defendant would safeguard their information, use it only for legitimate business purposes, and protect it against unauthorized access and disclosure. Consumers generally demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

27. Defendant solicited and accepted that PII subject to its representations regarding security. Defendant's public-facing Privacy Policy and other client communications acknowledge Defendant's receipt of, and responsibility for, this sensitive information.

***The Data Breach***

28. On or about May 11, 2026, Defendant began sending written notice of the Data Breach to affected individuals. Defendant sent Plaintiff a Notice Letter dated May 11, 2026, which informed Plaintiff that his personal information may have been involved in a "data security incident."[9]

29. Defendant's Notice Letter states, in relevant part:

> In April 2026, we became aware of unusual activity associated with one employee's computer. Upon discovery, we initiated a comprehensive investigation which revealed that certain client files within our tax

[9] Notice Letter, supra n.2.

> software may have been viewed without authorization between March 20 and April 3, 2026. We then took steps to contact clients and arranged to provide you this notice.[10]
>
> [T]he information may have included your name, Social Security number, and/or financial account number.[11]

30. By Defendant's own admission, the unauthorized intrusion lasted at least two weeks—from March 20, 2026 through April 3, 2026—before Defendant detected it. Defendant did not begin notifying affected individuals until on or about May 11, 2026, more than a month after the unauthorized access ended, and more than seven weeks after the intrusion began.

31. Notwithstanding Defendant's representations that it took the privacy and security of data under its care "very seriously,"[12] Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' PII. As a direct and proximate result, Plaintiff's and Class Members' sensitive PII was exposed to and accessed by unauthorized cyber-criminals.

32. On information and belief, the unauthorized actor accessed unencrypted PII and/or PII that was inadequately secured. Plaintiff and Class Members did not consent to the unauthorized access or disclosure of their PII.

---

[10] *Id.*
[11] *Id.*
[12] *Id.*

33. Defendant has reported the Data Breach to the Internal Revenue Service, further confirming the involvement of tax-related and Social Security number information.

34. Defendant's Notice Letter is materially deficient. Among other things, it omits: (a) the identity of the unauthorized actor or actors; (b) the root cause of the intrusion and the vulnerabilities exploited; (c) the specific means by which the unauthorized actor gained access through an employee's computer; (d) whether data was downloaded, copied, exfiltrated, or transmitted to third parties; (e) the specific categories of PII implicated for each affected individual; (f) the number of individuals impacted; (g) whether any of the affected information has appeared on the dark web; and (h) the specific remedial measures Defendant has implemented (beyond the general statement that it has "implemented additional technical security measures").[13]

35. Defendant offered Plaintiff and Class Members only 12 months of credit monitoring services through Kroll. Twelve months of credit monitoring is woefully inadequate given that compromised Social Security numbers retain their value to identity thieves indefinitely.

[13] *Id.*

36. Defendant's offer of credit monitoring and identity protection services constitutes an acknowledgment that Plaintiff's and Class Members' PII was, in fact, compromised in the Data Breach.

***The Data Breach Was Preventable***

37. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive PII it was maintaining for Plaintiff and Class Members.

38. Defendant could and should have prevented the Data Breach by implementing reasonable, commercially available cybersecurity safeguards. As explained by the Federal Bureau of Investigation, "prevention is the most effective defense against" cyber-attacks of this kind, "and it is critical to take precautions for protection."[14]

39. To prevent and detect cyber-attacks of the kind that befell Defendant, Defendant could and should have implemented, at a minimum, the following measures recommended by the United States Government and other authorities:[15]

- Implementing an awareness and training program to ensure that employees and individuals are aware of cyber-threats and how they are delivered;

[14]Federal Bureau of Investigation, How to Protect Your Networks from Ransomware, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.
[15]*Id*. at 3-4.

- Enabling strong spam filters to prevent phishing emails from reaching end users and authenticating inbound email using technologies such as SPF, DMARC, and DKIM;
- Scanning all incoming and outgoing emails to detect threats and filter executable files from reaching end users;
- Configuring firewalls to block access to known malicious IP addresses;
- Patching operating systems, software, and firmware on devices, and using a centralized patch-management system;
- Setting anti-virus and anti-malware programs to conduct regular scans automatically;
- Managing the use of privileged accounts based on the principle of least privilege;
- Configuring access controls—including file, directory, and network share permissions—with least privilege in mind;
- Disabling macro scripts from office files transmitted via email;
- Implementing Software Restriction Policies (SRP) or other controls to prevent programs from executing from common malware locations;
- Using application whitelisting, which only allows systems to execute programs known and permitted by security policy;
- Using multi-factor authentication for access to systems containing sensitive personal information;
- Encrypting sensitive data at rest and in transit; and
- Categorizing data based on organizational value and implementing physical and logical separation of networks and data for different organizational units.

40. As an accounting firm in custody of voluminous Social Security numbers, financial account numbers, and other highly sensitive tax-related PII, Defendant knew or should have known the importance of implementing each of these measures. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of these measures.

***Defendant Knew or Should Have Known of the Risk of a Cyber-Attack***

41. Defendant's data-security obligations were particularly important given the substantial increase in cyber-attacks and data breaches targeting accounting firms, tax-preparation firms, and other professional services providers that collect and store large volumes of PII.

42. Tax-preparation and accounting firms are widely recognized as high-value targets for cyber-criminals because of the volume and sensitivity of the data they hold—particularly Social Security numbers and tax-return information. Both the Internal Revenue Service and the Federal Trade Commission have repeatedly issued warnings urging tax professionals and accounting firms to implement enhanced security measures to protect taxpayer data.[16]

[16]See Internal Revenue Service, Identity Theft Information for Tax Professionals, https://www.irs.gov/identity-theft-fraud-scams/identity-theft-information-for-tax-professionals; Federal Trade Commission, Safeguarding Taxpayer Data: A Guide for Your Business, https://www.ftc.gov/system/files/documents/plain-language/pdf-0145_safeguarding_taxpayer_data.pdf.

43. In recent years, data breaches at accounting firms, tax preparers, and other professional services providers have become widespread and well-publicized. Defendant was on notice of, and should have anticipated, the very type of intrusion that occurred here.

44. Defendant knew and understood that unprotected or exposed PII—particularly Social Security numbers and financial account numbers—is highly valuable and sought after by nefarious third parties seeking to monetize that PII through identity theft and financial fraud.

45. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences if Defendant's data-security system was breached, including the significant costs that would be imposed on Plaintiff and Class Members as a result of such a breach.

46. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any actual fraudulent use of their PII.

47. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data-security measures for the PII of Plaintiff and Class Members.

### *The Value of Personally Identifiable Information*

48. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] "Identifying information" includes any name or number that may be used, alone or in conjunction with other information, to identify a specific person, including names, Social Security numbers, dates of birth, driver's license numbers, alien registration numbers, government passport numbers, and taxpayer identification numbers.

49. The PII of individuals remains of high value to criminals, as evidenced by the prices criminals will pay through the dark web. Numerous sources cite dark-web pricing for stolen identity credentials. Personal information can be sold at prices ranging from $40 to $200, and criminals can purchase access to entire company data breaches for $900 to $4,500.[18]

50. A stolen Social Security number, standing alone, can be used to wreak havoc on a victim's personal and financial life. Identity thieves use stolen Social

---

[17] 17 C.F.R. § 248.201.

[18] *See* Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/; Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/; In the Dark, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

Security numbers to commit, among other things: financial identity theft (such as opening fraudulent credit cards or loans); government identity theft (such as tax-refund fraud); criminal identity theft; medical identity theft; and utility fraud.[19]

51. Courts have referred to a stolen Social Security number as the "gold standard" for identity theft.[20] Social Security numbers are among the worst kind of PII to have stolen because they may be put to a wide variety of fraudulent uses and are difficult—and often impossible—for an individual to change.

52. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[21] Moreover, because many organizations still use Social Security numbers as a primary identifier, exposure to identity theft and fraud persists for the life of the victim.

---

[19] *See* 5 Things an Identity Thief Can Do with Your Social Security Number, Credit.com, https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[20] *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020).

[21] Social Security Administration, Identity Theft and Your Social Security Number, https://www.ssa.gov/pubs/EN-05-10064.pdf.

53. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number. Even then, a new Social Security number is often ineffective because credit bureaus and banks link the new number to the old.[22]

54. Stolen financial account numbers, also implicated by the Data Breach here, present additional concrete risks of unauthorized account access, fraudulent transfers, and account takeovers.

55. Compounding these risks, cyber-criminals routinely assemble compromised PII into so-called "Fullz" packages, which cross-reference stolen identity information with other publicly available or compromised data to build comprehensive dossiers on individual victims. The development of "Fullz" packages means that the PII stolen in the Data Breach can easily be linked with Plaintiff's and Class Members' phone numbers, email addresses, and other data points from

[22]Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

unregulated sources, and then sold and re-sold in perpetuity to additional criminal operators.[23]

56. The fraudulent activity resulting from the Data Breach may not come to light for months or years. According to the U.S. Government Accountability Office, stolen data may be held for up to a year or more before being used to commit identity theft, and once stolen data have been sold or posted on the dark web, fraudulent use of that information may continue indefinitely.[24]

### *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

57. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified that their PII was compromised, the reasonable

[23]"Fullz" is fraudster speak for data packages that include the identifying information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information a fraudster has on a victim, the more money can be made off of those credentials. Fullz packages are pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including by performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can be used for purposes such as tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account." See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

[24]U.S. Gov't Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking these steps could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

58. Indeed, Defendant's Notice Letter expressly directs Plaintiff and Class Members to take a series of mitigation steps, including reviewing account statements, monitoring credit reports, and enrolling in the offered Kroll identity-protection services. The Notice Letter further includes recommendations regarding fraud alerts, security freezes, and contacting consumer reporting bureaus.[25]

59. Defendant's extensive suggestion of steps that Plaintiff and Class Members "can do" to protect themselves[26] demonstrates the significant time and effort Plaintiff and Class Members must undertake in response to the Data Breach. Their time is highly valuable and irreplaceable. Plaintiff and Class Members have suffered actual injury in the form of lost time spent on mitigation activities in response to the Data Breach, including reviewing account statements, monitoring credit reports, changing passwords, addressing spam communications, and verifying the legitimacy of the Notice Letter.

[25] Notice Letter, supra n.2.
[26] *Id.*

60. These mitigation efforts are consistent with the steps the FTC and other federal authorities recommend that data-breach victims undertake to protect their personal and financial information.[27]

***Diminution of Value of PII***

61. PII is a valuable property right. Its value is well documented in case law, regulatory guidance, and the academic literature. The prevalence of an active, multi-billion-dollar legitimate marketplace for personal data—and a parallel black-market for stolen PII—demonstrates that PII has substantial market value.[28]

62. Consumers may sell their non-public information directly to data brokers, who in turn aggregate the information and provide it to marketers and developers. The fact that the legitimate market values PII confirms that the unauthorized loss or diminution of an individual's PII is a cognizable economic injury.[29]

---

[27] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps.

[28] *See, e.g.*, John T. Soma et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[29] *See* Suzanne Vranica, Data Brokers Aren't the Only Ones Selling Your Information, L.A. Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers; see also Datacoup, https://datacoup.com/; digi.me, https://digi.me/what-is-digime/.

63. As a result of the Data Breach, Plaintiff's and Class Members' PII—which has inherent market value in both legitimate and dark markets—has been damaged and diminished by its compromise and unauthorized release. The PII is now more readily available, and its rarity has been lost, thereby causing additional loss of value.

***Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

64. Given the type of intrusion in this case, the sophistication of cyber-criminals who target accounting firms, and the type of PII involved—particularly Social Security numbers—there is a strong probability that the stolen PII has been or will be placed on the dark web for sale and purchase by criminals intending to use the PII for identity theft and fraud, including opening bank accounts in victims' names, filing false tax returns, taking out loans or lines of credit, and filing false unemployment claims.

65. Such fraud may go undetected until debt-collection calls commence months or years later. An individual may not know that his PII was used to file for unemployment benefits until law enforcement notifies his employer of the suspected fraud. Fraudulent tax returns are typically discovered only when the victim's authentic tax return is rejected.

66. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

67. The retail cost of credit monitoring and identity-theft monitoring can cost approximately $200 per year per Class Member, or more. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. The 12 months of Kroll monitoring offered by Defendant is plainly insufficient to address risks that will persist for years.

***Loss of Benefit of the Bargain***

68. Defendant's poor data-security practices deprived Plaintiff and Class Members of the benefit of their bargain. Plaintiff and Class Members—whether direct M&J clients or customers, employees, or beneficiaries of M&J's clients—understood and reasonably expected that the fees paid to Defendant (whether directly or through Defendant's institutional clients) included the cost of adequate data security to protect their PII. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of lesser value than what they reasonably expected.

***Injunctive Relief Is Necessary to Protect Against Future Data Breaches***

69. Plaintiff and Class Members have an interest in ensuring that their PII, which remains in Defendant's possession, is protected from further breaches by the implementation of reasonable security measures and safeguards. Without injunctive relief, there is a substantial risk that Defendant will continue to inadequately safeguard the PII of Plaintiff and Class Members.

***Plaintiff Anthony Brunetti's Experience***

70. At the time of the Data Breach, Defendant maintained Plaintiff Brunetti's PII in its system.

71. Plaintiff received a Notice Letter from Defendant dated May 11, 2026, which informed him that his name, Social Security number, and/or financial account number may have been compromised in the Data Breach.

72. Plaintiff Brunetti is a cautious person and is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. He stores any documents containing his PII in a safe and secure location or destroys them. Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed.

73. As a result of the Data Breach, Plaintiff Brunetti has spent and will continue to spend considerable time dealing with the consequences of the Data Breach, including verifying the legitimacy of the Notice Letter, self-monitoring his financial accounts, reviewing his credit, reviewing and updating his passwords, and responding to and managing an increase in spam communications. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Notice Letter, which advised Plaintiff to mitigate his damages by, among other things, monitoring his accounts and credit for fraudulent activity.

74. Plaintiff Brunetti has experienced an increase in spam calls, texts, and/or emails since the Data Breach, which, on information and belief, was caused by the Data Breach. This misuse of his PII is caused, on information and belief, by the fact that cyber-criminals can easily use information compromised in a breach to associate a victim's identity with publicly available contact information and to target the victim for phishing attacks or further identity theft schemes.

75. The Data Breach has caused Plaintiff Brunetti to suffer a loss of privacy.

76. The loss of privacy and the substantial present risk of future imminent harm have caused Plaintiff Brunetti to suffer stress, fear, and anxiety as Plaintiff is concerned that his sensitive PII is now in the hands of data thieves and is likely to remain that way for the remainder of his lifetime, and there is little he can do to retrieve his stolen PII from the cyber-criminals who hold it.

77. Plaintiff Brunetti is aware of no other source from which the theft of his PII could have come. He regularly takes steps to safeguard the PII within his own control.

78. Plaintiff Brunetti would not have entrusted his PII to Defendant, or to any entity that provided that PII to Defendant, had he known of Defendant's inadequate data-security practices.

79. Plaintiff Brunetti has a continuing interest in ensuring that his PII, which on information and belief remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

80. Plaintiff brings this action on behalf of himself and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4), and/or 23(c)(5).

81. Plaintiff seeks to represent the following Class and Subclass:

**Nationwide Class:**
All persons residing in the United States whose PII was accessed and/or compromised as a result of the data breach announced by Defendant Mauldin & Jenkins, LLC in or about May 2026.

**Georgia Subclass:**
All persons residing in the State of Georgia whose PII was accessed and/or compromised as a result of the data breach announced by Defendant Mauldin & Jenkins, LLC in or about May 2026.

82. Collectively, the Nationwide Class and Georgia Subclass are referred to herein as the "Class" unless otherwise specified. Excluded from the Class are: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; any individual who timely and properly elects to be excluded from the Class; any judge or judicial officer

assigned to hear any aspect of this litigation, and their immediate family members; and counsel of record and their immediate family members.

83. Plaintiff reserves the right to amend the Class and Subclass definitions, or to add additional subclasses, if further investigation or discovery indicates that the definitions should be narrowed, expanded, or otherwise modified.

84. **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The members of the Class are so numerous that joinder of all members is impracticable. On information and belief, Defendant's Data Breach impacted thousands of individuals across the United States, including hundreds of individuals residing in Georgia. The exact number of Class Members is presently unknown but can readily be ascertained from Defendant's records, as Defendant has already identified those individuals as evidenced by its sending of Notice Letters.

85. **Commonality (Fed. R. Civ. P. 23(a)(2)).** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members. Such common questions include, but are not limited to:

- Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;
- Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

- Whether Defendant had duties not to use the PII of Plaintiff and Class Members for non-business purposes;
- Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;
- Whether and when Defendant actually learned of the Data Breach;
- Whether Defendant adequately, promptly, and accurately notified Plaintiff and Class Members that their PII had been compromised;
- Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;
- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Defendant adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;
- Whether Defendant's conduct violated Section 5 of the Federal Trade Commission Act;
- Whether Defendant's conduct violated the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 et seq.;
- Whether Defendant's conduct violated the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 et seq.;
- Whether Plaintiff and Class Members are entitled to actual, nominal, statutory, and/or consequential damages as a result of Defendant's wrongful conduct;
- Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

86. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiff's claims are typical of the claims of other Class Members because Plaintiff, like every other Class Member, was exposed to virtually identical conduct by Defendant and suffered the same violations of the law as a result. Plaintiff's PII was compromised in the Data Breach; he received the same form Notice Letter; and he suffered the same categories of harm as other Class Members.

87. **Adequacy (Fed. R. Civ. P. 23(a)(4)).** Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members, and Plaintiff seeks no relief that is antagonistic or adverse to other Class Members. Plaintiff has retained counsel experienced in complex class-action and data-breach litigation, and intends to prosecute this action vigorously.

88. **Policies Generally Applicable to the Class (Fed. R. Civ. P. 23(b)(2)).** This action is appropriate for certification under Rule 23(b)(2) because Defendant acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive and corresponding declaratory relief on a class-wide basis.

89. **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)).** Class certification is appropriate under Rule 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual Class Members,

and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The damages suffered by individual Class Members are relatively modest compared to the burden and expense of individual litigation, making it impracticable for Class Members to redress the wrongs done to them on an individual basis. Individualized litigation would also risk inconsistent or contradictory judgments arising from the same set of facts and increase the delay and expense to all parties and the courts.

90. **Particular Issues (Fed. R. Civ. P. 23(c)(4)).** Particular issues are appropriate for certification because such issues present common questions, the resolution of which would advance the disposition of this matter and the parties' interests therein, including: (i) whether Defendant failed to timely notify Plaintiff and the Class of the Data Breach; (ii) whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII; (iii) whether Defendant's security measures were reasonable in light of industry standards and best practices; (iv) whether Defendant's failure to institute adequate security measures amounted to negligence; (v) whether Defendant failed to take commercially reasonable steps to safeguard PII; and (vi) whether adherence to FTC guidance and measures recommended by data-security experts would have reasonably prevented the Data Breach.

91. **Manageability.** This action is manageable as a class action. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members within Defendant's own records demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE AND NEGLIGENCE PER SE

**(On Behalf of Plaintiff and the Nationwide Class)**

92. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

93. Defendant required Plaintiff and Class Members (whether directly or through Defendant's institutional clients) to provide their PII in the ordinary course of Defendant's tax, accounting, assurance, and advisory services, which affect interstate commerce.

94. Defendant gathered, stored, and used the PII of Plaintiff and Class Members for its own commercial gain. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

95. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

96. By voluntarily undertaking and assuming the responsibility to collect, store, and use this data, Defendant assumed a duty of care to use reasonable means to secure and safeguard its computer systems—and the PII held within them—to prevent unauthorized disclosure of the information and to safeguard the information from theft. Defendant's duty included the responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt and adequate notice to those affected in the case of a data breach.

97. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other applicable requirements, and to ensure that its systems and networks adequately protected the PII.

98. Defendant's duty of care arose, among other things, as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and Class Members entrusted Defendant with their confidential PII—a necessary part of obtaining services from Defendant or from Defendant's institutional clients.

99. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes, regulations, and common-law principles described herein, but also because Defendant is bound by industry standards to protect confidential PII.

100. Defendant also had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach, including the timing, scope, nature, and specific types of PII compromised. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and fraudulent use of their PII by third parties.

101. **Negligence Per Se.** In addition to the common-law duties described above, Defendant had a duty to provide fair, reasonable, and adequate computer systems and data-security practices to safeguard Plaintiff's and Class Members' PII under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

102. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses—such as Defendant—of failing to use reasonable measures to protect PII. Various FTC publications, guidance documents, and enforcement orders also form the basis of Defendant's duty in this regard.

103. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by failing to comply with applicable industry

standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant obtained and stored, and the foreseeable consequences of a data breach on Defendant's systems.

104. Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act was intended to protect. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data-security measures, caused the same harm suffered by Plaintiff and Class Members.

105. Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

106. **Breach.** Defendant breached its duties, including those owed under common law, the FTC Act, and applicable industry standards, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of its networks and systems;

c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been compromised—despite the unauthorized intrusion lasting at least two weeks;

e. Failing to adequately train employees regarding cybersecurity, including phishing and other social-engineering attacks;

f. Failing to remove or properly secure PII it was no longer required to retain;

g. Failing to encrypt sensitive PII at rest and in transit;

h. Failing to implement appropriate access controls and the principle of least privilege; and

i. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

107. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class were reasonably foreseeable, particularly in light of Defendant's inadequate security practices and the well-documented frequency of cyber-attacks targeting accounting and tax-preparation firms.

108. Plaintiff and Class Members had no ability to protect their PII that was in, and on information and belief remains in, Defendant's possession. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

109. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

110. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

111. There is a close causal connection between Defendant's failure to implement reasonable security measures and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII.

112. As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) actual misuse of compromised data, including an increase in spam communications; (vii) nominal damages; and (viii) the continued and substantially increased risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

113. Additionally, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and harm, including anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

114. Plaintiff and Class Members are entitled to actual, compensatory, nominal, and consequential damages suffered as a result of the Data Breach, as well as injunctive relief requiring Defendant to, among other things, strengthen its data-security systems and monitoring procedures, submit to annual third-party audits of those systems, and provide adequate credit-monitoring and identity-theft protection services to all Class Members.

**COUNT II**

**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiff and the Nationwide Class)**

115. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

116. The PII of Plaintiff and Class Members, including their full names, Social Security numbers, and/or financial account numbers, was provided to and entrusted to Defendant, either directly or indirectly through Defendant's institutional clients, as part of Defendant's regular business practices.

117. In providing their PII to Defendant, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and

confidential, and to timely and accurately notify Plaintiff and Class Members if their data was breached, compromised, or stolen.

118. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Defendant and/or Defendant's clients with the reasonable understanding that their PII would be adequately protected from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive PII is exchanged as a condition of receiving services. It is common sense that, but for this implicit and/or explicit agreement, Plaintiff and Class Members would not have provided their PII.

119. Defendant's contractual obligations are evidenced by Defendant's public-facing Privacy Policy, which describes Defendant's collection of highly sensitive personal and financial information—including "social security numbers and other tax identification numbers" and "bank accounts, and other financial accounts"[30]—and by Defendant's representations in its Notice Letter that it "takes the privacy and security of the data under [its] care very seriously."[31]

120. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

---

[30] Mauldin & Jenkins, Privacy Policy, supra n.5.
[31] Notice Letter, supra n.2.

121. Defendant breached the implied contracts it made with Plaintiff and Class Members by, among other things, (i) failing to safeguard and protect their PII; (ii) failing to implement adequate technical and organizational safeguards consistent with industry standards; (iii) failing to detect the Data Breach in a timely manner; and (iv) failing to provide timely and accurate notice that PII was compromised as a result of the Data Breach.

122. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members have suffered the injuries and damages described herein, including out-of-pocket expenses, lost time and opportunity costs, diminution in the value of their PII, and the continued increased risk of identity theft and fraud.

123. Plaintiff and Class Members are entitled to recover their actual, nominal, and consequential damages, together with reasonable attorneys' fees and costs.

**COUNT III**

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiff and the Nationwide Class, in the Alternative)**

124. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

125. Plaintiff brings this Count in the alternative to the Breach of Implied Contract count above.

126. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they (directly or through Defendant's institutional clients) paid for or contributed to the cost of Defendant's services, and they provided Defendant with their PII. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security.

127. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from that retained data and used Plaintiff's and Class Members' PII for business purposes.

128. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate or perform for the value that their PII provided.

129. Defendant acquired the PII through inequitable practices, as it failed to investigate and/or disclose the inadequate data-security practices alleged herein.

130. If Plaintiff and Class Members had known that Defendant would not use adequate data-security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have provided their PII to Defendant or obtained services from Defendant or Defendant's clients on the same terms.

131. Defendant enriched itself by saving the costs it reasonably should have expended on data-security measures to secure Plaintiff's and Class Members' PII.

Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security of their PII.

132. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

133. Plaintiff and Class Members are entitled to restitution and/or disgorgement of profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, including through the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**COUNT IV**

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390 et seq.**

**(On Behalf of Plaintiff and the Georgia Subclass)**

134. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

135. The Georgia Fair Business Practices Act ("GFBPA"), O.C.G.A. § 10-1-390 et seq., prohibits "[u]nfair or deceptive acts or practices in the conduct of

consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393(a).

136. Plaintiff and members of the Georgia Subclass are "consumers" within the meaning of O.C.G.A. § 10-1-392(a)(6), and Defendant's collection, storage, use, and disclosure of their PII in connection with the provision of tax, accounting, assurance, and advisory services constitutes a "consumer transaction" and "consumer act or practice in trade or commerce" within the meaning of the GFBPA.

137. Defendant engaged in unfair and deceptive acts and practices in the conduct of consumer transactions and consumer acts and practices in trade or commerce, including, but not limited to:

a. Failing to implement and maintain reasonable security measures to protect the PII of Plaintiff and Georgia Subclass members, despite knowing that such PII—including Social Security numbers and financial account numbers—was a foreseeable target of cyber-criminals;

b. Misrepresenting, expressly and by implication, that Defendant would take reasonable steps to safeguard the PII of Plaintiff and Georgia Subclass members, including through statements in Defendant's Privacy Policy and other client-facing communications;

c. Omitting and concealing material facts regarding the inadequacy of Defendant's data-security practices, on which Plaintiff and Georgia Subclass

members reasonably relied in entrusting their PII to Defendant or to entities that provided that PII to Defendant; and

d. Failing to provide timely, complete, and accurate notice of the Data Breach to Plaintiff and Georgia Subclass members.

138. Defendant's acts and practices were unfair under the GFBPA because they caused or were likely to cause substantial injury to consumers that was not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

139. Defendant's acts and practices were deceptive under the GFBPA because Defendant's representations and omissions regarding the security of Plaintiff's and Georgia Subclass members' PII were likely to mislead reasonable consumers acting reasonably under the circumstances, and were material to consumers' decisions to entrust Defendant with their PII.

140. Defendant's conduct impacted the consumer marketplace in Georgia and is not a private, individualized dispute. Defendant is a Georgia-headquartered accounting firm that collects and maintains the sensitive PII of thousands of Georgia consumers. The Data Breach affected, and Defendant's practices continue to affect, consumers throughout Georgia.

141. Pursuant to O.C.G.A. § 10-1-399(b), Plaintiff will, prior to seeking individual damages under the GFBPA, deliver to Defendant the written demand for

relief required by that section. Plaintiff brings this Count, at this stage, for injunctive and declaratory relief, including an order enjoining Defendant from continuing its unfair and deceptive practices and requiring Defendant to implement reasonable data-security measures. Plaintiff reserves the right to amend this Complaint to seek individual and Class-wide damages under the GFBPA upon expiration of the statutory pre-suit notice period.

142. As a direct and proximate result of Defendant's violations of the GFBPA, Plaintiff and members of the Georgia Subclass have suffered and will continue to suffer injury in fact and actual damages, including the harms described herein.

143. Plaintiff and members of the Georgia Subclass are entitled to injunctive relief, declaratory relief, attorneys' fees and costs, and (upon completion of statutory pre-suit notice procedures) all damages and other relief available under the GFBPA, including but not limited to those provided by O.C.G.A. § 10-1-399.

**COUNT V**

**<u>VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT, O.C.G.A. § 10-1-370 et seq.</u>**

**(On Behalf of Plaintiff and the Georgia Subclass)**

144. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

145. The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), O.C.G.A. § 10-1-370 et seq., declares that a person engages in a "deceptive trade practice" when, in the course of his business, vocation, or occupation, he, among other things, "represents that goods or services have . . . characteristics . . . that they do not have" and "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. § 10-1-372(a).

146. Defendant engaged in deceptive trade practices in the course of its business and occupation, including, but not limited to, the following:

a. Representing, expressly and by implication, that Defendant's services had data-security characteristics, safeguards, and protections that they did not, in fact, have;

b. Representing, including through its Privacy Policy and other client-facing communications, that Defendant maintained reasonable measures to protect the confidentiality and security of PII when, in fact, Defendant did not;

c. Engaging in conduct that creates a likelihood of confusion or misunderstanding among Plaintiff and members of the Georgia Subclass regarding the nature, adequacy, and reliability of Defendant's data-security practices.

147. Defendant's deceptive trade practices continue. On information and belief, Defendant continues to hold the PII of Plaintiff and members of the Georgia Subclass, and Defendant's data-security practices remain inadequate. Plaintiff and

members of the Georgia Subclass remain likely to be damaged by Defendant's deceptive trade practices in the future absent injunctive relief.

148. Pursuant to O.C.G.A. § 10-1-373, Plaintiff and members of the Georgia Subclass are entitled to injunctive relief restraining Defendant from continuing to engage in these deceptive trade practices, together with their reasonable attorneys' fees and costs.

**COUNT VI**

**DECLARATORY JUDGMENT (28 U.S.C. § 2201)**

**(On Behalf of Plaintiff and the Nationwide Class)**

149. Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

150. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. This Court also has broad authority to restrain acts that are tortious and violate the terms of the federal and common law described in this Complaint.

151. Defendant owes a duty of care to Plaintiff and Class Members, which requires Defendant to adequately secure Plaintiff's and Class Members' PII.

152. On information and belief, Defendant still possesses Plaintiff's and Class Members' PII.

153. Defendant's data-security measures remain inadequate. Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII, and the risk remains that further compromises of their PII will occur.

154. Accordingly, there is an actual case or controversy between Plaintiff and the Class, on the one hand, and Defendant, on the other, regarding the parties' respective rights and obligations.

155. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter judgment declaring, among other things, that:

a. Defendant owes a legal duty to secure the PII of Plaintiff and Class Members from unauthorized access and disclosure;

b. Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to protect Plaintiff's and Class Members' PII; and

c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' PII.

156. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with legal and industry standards to protect Plaintiff's and Class Members' PII, including by:

a. Engaging third-party security auditors and penetration testers, as well as internal security personnel, to conduct periodic testing—including simulated

attacks, penetration tests, and audits—of Defendant's systems, and ordering Defendant to promptly correct any problems or issues identified;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training Defendant's security personnel regarding any new or modified procedures;

d. Segmenting Defendant's networks and applications by, among other things, creating firewalls and access controls so that, if one area of Defendant's network is compromised, intruders cannot gain access to other portions of Defendant's systems;

e. Conducting regular database scanning and security checks;

f. Implementing multi-factor authentication and encryption for systems containing sensitive PII;

g. Routinely and continually conducting internal training and education to inform internal personnel how to identify and contain a breach when it occurs, and what to do in response;

h. Routinely and continually purging PII that is no longer necessary to conduct Defendant's business operations;

i. Providing lifetime credit monitoring and identity-theft insurance to Plaintiff and Class Members; and

j. Meaningfully educating Class Members about the threats they face as a result of the loss of their PII and the steps they should take to protect themselves.

157. Absent injunctive relief, Plaintiff and Class Members will suffer irreparable injury and lack an adequate legal remedy. The risk of another data breach at Defendant is real, immediate, and substantial, and the hardship to Plaintiff and the Class if an injunction does not issue substantially exceeds any hardship to Defendant if an injunction is issued. Issuance of the requested injunction will not disserve the public interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, respectfully requests that this Court enter judgment against Defendant and grant the following relief:

a. An order certifying the Nationwide Class and the Georgia Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

b. An award of actual, statutory, nominal, and consequential damages, in an amount to be determined at trial, as allowed by law;

c. An award of restitution, disgorgement, and/or other equitable monetary relief, as appropriate;

d. Declaratory relief as described herein, including a declaration that Defendant owed and continues to owe a duty to safeguard the PII of Plaintiff and Class Members, that Defendant breached that duty, and that Defendant's existing data-security measures are inadequate;

e. Injunctive and equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein, including the misuse and/or disclosure of Plaintiff's and Class Members' PII, and requiring Defendant to implement reasonable and adequate data-security measures, including those described herein;

f. An order requiring Defendant to provide lifetime credit-monitoring and identity-theft protection services to Plaintiff and Class Members;

g. An order requiring Defendant, for a period of not less than 10 years, to engage a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance;

h. An award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

i. An award of pre-judgment and post-judgment interest on all amounts awarded, at the maximum rate allowed by law; and

j. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: May 22, 2026

Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner
Georgia Bar No. 418426
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, Georgia 30303
Tel: (771) 772-3086
*cturner@milberg.com*

Spencer D. Campbell*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Tel: (513) 651-3700
*scampbell@msdlegal.com*

*Counsel for Plaintiff and the Putative Class*

* *Pro Hac Vice* application forthcoming